**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

In re:

THE CONDOMINIUM ASSOCIATION OF
THE LYNNHILL CONDOMINIUM,

　　　　　　　　　　Debtor.[1]

Case No. 18-10334

Chapter 11

**DEBTOR'S EXPEDITED MOTION FOR INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING,**
**(II) GRANTING PRIMING LIENS AND SUPERPRIORITY CLAIMS,**
**(III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

The Condominium Association of the Lynnhill Condominium (the "Debtor"), as debtor

and debtor-in-possession and pursuant to sections 105(a), 362, 363, 364 and 507 of the U.S.

Bankruptcy Code,[2] Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Local Rules 4001-4 and 4001-5,[3] respectfully requests

entry of an interim and final order (respectively, the "Interim Order" and the "Final Order"):

　　　　(i)　　　authorizing the Debtor to obtain a $1,250,000.00[4] secured post-petition loan (the

"DIP Loan") from AHH16 Development, LLC or its designee ("AHH," or in its capacity as

lender under the DIP Loan, the "DIP Lender") pursuant to the terms and conditions in this

Motion and in the *Amended Commitment Letter of AHH16 Development, LLC or its Designee to*

---

[1]　The Debtor's federal identification number is 52-0993760.

[2]　11 U.S.C. §§ 101–1532 (2012) (the "Bankruptcy Code").

[3]　Unless otherwise indicated, section references are to the Bankruptcy Code, rule references are to the
　　Bankruptcy Rules, and local rule references are to the Local Bankruptcy Rules of the U.S. Bankruptcy
　　Court for the District of Maryland.

[4]　At the Debtor's request, the DIP Lender made a $400,000 advance pre-petition. As explained below,
　　the Debtor requests that the entire $1,250,000.00 be treated as post-petition secured financing with a
　　roll-up of the $400,000.00 advance into the DIP Loan.

*Be Purchaser of the Property and Post-Petition Secured Lender in Connection with Lynnhill Condominium Bankruptcy Case* attached as **Exhibit A** (the "Commitment");

(ii)     authorizing the Debtor to use the DIP Loan proceeds to pay for the Debtor's post-petition expenses, including expenses necessary to preserve, protect and sell the Property (defined below) and this bankruptcy case;

(iii)     granting the DIP Lender (a) first-priority security interests in and liens on all of the Debtor's assets, including the Property, to secure the obligations under the DIP Loan, and (b) superpriority administrative expense claims, subject to a carveout for the U.S. Trustee's quarterly fees (the "Carveout"); and

(iv)     scheduling a final hearing on this Motion (the "Final Hearing") before February 1, 2018 to consider entry of the Final Order authorizing the relief requested in this Motion.

In support of this Motion, the Debtor relies on the (a) *Declaration of Stanley Briscoe in Support of First Day Motions* ("Briscoe Declaration"), (b) *Declaration of Robin Williams in Support of First Day Motions* ("Williams Declaration"), and (c) *Declaration of Jeffrey Kaufman in Support of First Day Motions* ("Kaufman Declaration"), filed contemporaneously with this Motion and respectfully states as follows:[5]

### **Preliminary Statement**

1.     The Debtor is an unincorporated condominium association that has been plagued by financial and other problems for over ten years.  The Lynnhill Apartments was a condominium regime consisting of two 7-story buildings located at 3103 and 3107 Good Hope Avenue, Temple Hills, Maryland 20748 (the "Property").  The Property, completely vacant since

---

[5]  Pursuant to Local Rule 9013-2, in lieu of submitting a memorandum in support of this Motion, the Debtor will rely solely on the grounds and authorities set forth in this Motion.

2

approximately August 2017, has 219 units (collectively, the "Units"), a parking lot and common areas.

2.    In theory, the Debtor was to be funded by monthly condominium fees collected from residents of the Property.  The Debtor's ability to collect condominium fees from residents became increasingly difficult over the years affecting the Debtor's ability to pay for property insurance and utilities, and preventing the Debtor from making necessary repairs and capital improvements to the Property.  As a result, the Property's condition deteriorated significantly, to the point that utilities were terminated on more than one occasion, by mid-2017 the Property was approximately 40% vacant, and by September 2017, utilities were conclusively terminated and the balance of the Units were vacated and abandoned.  Indeed, Prince George's County (the "County") has determined that the Property is uninhabitable and has threatened to condemn the Property.

3.    To address the issues confronting the Debtor, the County and other parties in interest, on October 4, 2017, the Circuit Court for the County (the "Circuit Court") entered a judgment and order authorizing the Debtor to conduct a sale process and convey the Property, including through the chapter 11 bankruptcy process.  *See* Am. Findings of Facts, Conclusions of Law and Am. Judgment, *Consumer Prot. Div. Office of the Md. Attorney Gen. v. Lynnhill Condo. Dev., Inc.*, No. CAE16-40059 (Cir. Ct. Prince George's Cnty. Nov. 2, 2017), attached as **Exhibit B** (the "Circuit Court Order") (The Circuit Court's Order was amended on November 2, 2017.).

4.    On September 24, 2017, after interviewing approximately a half-dozen brokers, the Debtor agreed to retain Transwestern as real estate broker to procure the highest and best purchaser for the Property.

3

4844-2502-6905.v11

5.      Following a rigorous marketing process, the Debtor secured a $13.2 million bid from AHH for the Property, which was later adjusted by a $1 million credit due to the results of AHH's due diligence.  *See* Exhibit A at 1.  As set forth in the Commitment, AHH's due diligence is complete and not a basis for AHH to avoid complying with the Commitment or for refusing to close on the sale of the Property.  *See id.*

6.      As set forth herein, AHH's offer was designated by the Debtor, in consultation with all of its professionals, as the highest and best offer to purchase the Property.  AHH's offer includes funding the Debtor's bankruptcy case through the Pre-Petition Advance (defined below) and the DIP Loan, which funds will be credited against the purchase price for the Property.

7.      Without the Pre-Petition Advance, the Debtor could not have taken crucially necessary action prior to the Petition Date to protect and preserve the Property and immediately sell the Property, for the benefit of all of the Debtor's stakeholders.  Specifically, the Pre-Petition Advance enabled the Debtor to (i) secure property insurance, (ii) pay for around the clock security guards at the Property, (iii) retain a reputable preservation company to begin winterizing the Property and to take steps to preserve the Property so that it would not continue to deteriorate, and (iv) prepare the documentation to commence this chapter 11 case.

8.      As described below, this is not the first time the Debtor has moved this Court for the relief it so desperately needs.  However, this is the first time that the Debtor has been able to secure a reputable and reliable "partner"– AHH–who not only has the experience and determination to purchase and rehabilitate the Property for the benefit of all of the Debtor's constituents, but has undertaken the considerable time and expense to fashion an appropriate restructuring plan with the Debtor and has advanced (or has caused to be advanced) all of the

4844-2502-6905.v11

funding necessary for the Debtor to preserve and protect the Property and to secure the highest and best purchase price.

9.      Without the DIP Loan, the Debtor will be unable to fund the administrative expenses of this case and to document and effectuate the sale of the Property to AHH.  The DIP Loan is therefore necessary to sell and literally create value (where there presently is none) for the Property, and to avoid potential condemnation of the Property to the detriment of the Debtor, its creditors, and all parties in interest.

**Concise Statements Pursuant To Rule 4001 and Local Rule 4001-5(a)(2)**

10.      <u>Obtaining Credit</u>.  As required by Rule 4001(c) and Local Rule 4001-5(a)(2), the following is a summary of the material terms of the DIP Loan and the Interim DIP Order:

| MATERIAL TERMS | SUMMARY OF DIP LOAN |
|---|---|
| **Borrower**: | The Debtor.  *See* p. 1 of the Commitment. |
| **DIP Lender**: | AHH16 Development, LLC or its designee.  *See* p. 1 of the Commitment. |
| **DIP Loan Amount**: | A superpriority, priming loan in an aggregate principal amount of $1,250,000.00, consisting of $850,000.00 of new money and a $400,000.00 roll-up of the Pre-Petition Advance, which was needed to pay for insurance and to provide initial financing for this chapter 11 proceeding.  *See* p. 2 of the Commitment; Interim Order ¶¶ 4,8,10. |
| **Use of Proceeds**: | In accordance with the budget attached as **Exhibit C** (the "Budget"), the DIP Loan proceeds will be used to, among other things, (i) pay expenses related to the Property, including winterization (and services needed to aid the professionals engaged in the winterization efforts), and security; (ii) case administration costs and expenses, including retainers for the Debtor's bankruptcy counsel ("Pillsbury"); and (iii) to treat the DIP Lender's Pre-Petition Advance as having been effectively re-paid such that a total of $1,250,000.00 will have been advanced on a post-petition basis.  *See* p. 2 of the Commitment; Interim Order ¶ 4. |
| **Interim Availability**: | Upon entry of the Interim Order, new cash of $450,000.00 under the DIP Loan shall be funded subject to the terms of the Commitment and Interim Order.  *See* p. 1 of the Commitment; Interim Order ¶ 4. |
| **Final Availability**: | Upon entry of the Final Order, the unfunded balance of the DIP Loan (*i.e.*, $400,000.00 in new money) shall be made available, subject to compliance with the terms, conditions and covenants in the Commitment and the Interim Order.  *See* p.1 of the Commitment; Interim Order ¶ 4. |

4844-2502-6905.v11

| | |
|---|---|
| **Priority and Liens/ Security/Collateral**: | **Superpriority Administrative Expense Claim**:  Pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Loan, up to $75,000.00 of AHH's fees and expenses incurred in connection with the DIP Loan, the purchase of the Property and this chapter 11 case, and any claim (arising from the Debtor's default and a breach) under the Purchase and Sale Agreement for the sale of the Property (collectively, the "DIP Claims") shall constitute allowed superpriority claims under section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to a the Carveout for the U.S. Trustee's quarterly fees. *See* Interim Order ¶ 8. |
| | **DIP Collateral**:  Pursuant to section 364(c)(2) and (d) of the Bankruptcy Code, the DIP Claims shall be secured by a perfected first-priority lien on any and all current and future assets of the Debtor of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable (excluding any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, including causes of action and recoveries pursuant to chapter 5 of the Bankruptcy Code), all other tangible and intangible assets, the Property, and any and all proceeds of the foregoing. *See* p. 2 of the Commitment; Interim Order ¶ 10.  The DIP Lender's security will not extend to funds held by Pillsbury as a retainer to secure the payment of fees and expense incurred in connection with Pillsbury's representation of, and engagement with, the Debtor; and such funds are specifically excluded from DIP Collateral. |
| | **Priority**:  Pursuant to section 364(d) of the Bankruptcy Code, the security interest against the DIP Collateral constitutes a lien ranking senior and prior to all other claims and liens against the DIP Collateral, including the Property (the "Priming Lien"). The Priming Lien will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any prepetition loan and security agreements and other liens.  Upon entry of the Final Order, the Priming Lien will not be subject to challenge, but instead will attach and become valid and perfected without the requirement of any further action by the DIP Lender.  *See* p. 2 of the Commitment; Interim Order ¶ 10. |
| **Funding Date**: | **Interim Funding**:  Upon entry of the Interim Order. *See* Interim Order ¶ 4. |
| | **Final Funding**:  Upon entry of the Final Order.  *See* Interim Order ¶ 4. |
| **Term/Maturity**: | In the absence of a Termination Event, the DIP Claims shall become due and payable in full in cash on February 13, 2018, unless the confirmation or sale order is entered, whereupon the loan term is extended through the closing on the sale of the Property. *See* p. 3 of the Commitment; *See* Interim Order ¶ 14. |
| **Interest Rate**: | Six percent per annum.  *See* p. 2 of the Commitment. |
| **Default Interest Rate**: | Upon the occurrence of a Termination Event and during the continuation of such an event, interest shall accrue on outstanding amounts at 12% per annum.  *See* p. 2 of the Commitment. |
| **Fees**: | A commitment fee of $50,000.00 earned in full at the commencement of the DIP Loan, plus up to $75,000 of AHH's fees and expenses incurred in connection with the DIP Loan, the purchase of the Property and this chapter 11 case.  *See* p. 2 of the Commitment.  These fees are in addition to, and not included in, the principal sum of the $1,250,000.00 commitment. |

6

4844-2502-6905.v11

| | |
|---|---|
| **Termination Events/ Events of Default**: | The commitment under the DIP Loan will terminate upon the earliest to occur of the following, unless waived in writing by the DIP Lender (each, a "Termination Event"): <br><br> • The Debtor fails to provide the DIP Lender and its agents with continuing reasonable and complete access to the Property, the Debtor's management (as may be requested from time to time) and the Debtor's books and records. <br><br> • The Debtor's failure to file a chapter 11 petition, post-petition financing motion and a chapter 11 plan and disclosure statement, on or before January 12, 2018. <br><br> • The Debtor's failure to obtain the Interim Order reasonably acceptable to the DIP Lender, by January 22, 2018 and the Final Order, reasonably acceptable to the DIP Lender, on or before February 2, 2018. <br><br> • The Debtor or any of its principals or agents actively seeking another purchaser for the Property after the Petition Date; provided, however, that notwithstanding anything to the contrary, in the exercise of their fiduciary duties, the Debtor and its principals and agents shall be entitled to respond to all prospective purchasers, and shall be obliged to follow any court order regarding further marketing or auctioning of the Property (in each case without the events constituting a Termination Event). <br><br> • The Debtor's failure to obtain entry of a final order confirming the plan reasonably acceptable to the DIP Lender, on or before February 13, 2018. <br><br> • The entry of an order limiting, precluding or preventing the DIP Lender (or its designees) from credit bidding or challenging any or all of the DIP Claims with respect to any proposed disposition of the Property (in connection with a plan, auction process, selection of a plan sponsor/funder or otherwise) at any time in the Debtor's bankruptcy case(s). <br><br> • Conversion of this case to a chapter 7 case. <br><br> • An event of termination under the Purchase and Sale Agreement for the Property. <br><br> • Mutual agreement of the Debtor and DIP Lender. <br><br> *See* p. 3 of the Commitment; Interim Order ¶ 13. |
| **DIP Loan Closing Conditions**: | The DIP Loan is subject to: (i) entry of the Interim Order and the Final Order; and (ii) execution of any definitive legal documents (if any) with respect to the DIP Loan reasonably demanded by the DIP Lender, all prior to the final hearing on the DIP Loan. *See* p. 3 of the Commitment. |
| **Lender Sponsored Transaction**: | The Commitment provides for the sale of the Property to AHH or its designee for $13.2 million (less a credit of $1 million for certain life, health and safety requirements of the County in connection with rehabbing the Property) under the terms of a chapter 11 plan. AHH or its designee shall receive credit against the purchase price for all amounts and fees advanced and accrued under the DIP Loan (except that AHH's fees and expenses incurred in connection with the DIP Loan, the purchase of the Property and this chapter 11 case are capped at $75,000) and the $250,000 deposit that will be posted by AHH. The plan shall provide that the sale of the Property shall be free of transfer taxes under section 1146(a) of the Bankruptcy Code and any other related provision. *See* p. 3 of the Commitment; Interim Order ¶ F. |

4844-2502-6905.v11

| | |
|---|---|
| **Milestones**: | 1. The Debtor shall file a chapter 11 petition, this post-petition financing motion and a plan and disclosure statement, on or before January 12, 2018.<br><br>2. The Debtor shall obtain the Interim Order reasonably acceptable to the DIP Lender, by January 22, 2018 and the Final Order, reasonably acceptable to the DIP Lender, on or before February 2, 2018.<br><br>3. The Debtor's failure to obtain a final order confirming the plan reasonably acceptable to the DIP Lender, on or before February 13, 2018.<br><br>*See* p. 3 of the Commitment. |
| **Cross-Collateralization Protection (Local Rule 4001-5(a)(2)(A))**: | None. |
| **Provisions Regarding the Validity, Perfection or Amount of the Secured Creditor's Pre-Petition Lien Without Giving Parties at least 75 days from Entry of Order (Local Rule 4001-5(a)(2)(B))**: | Not applicable. The DIP Lender is not a traditional long-term pre-petition lender to the Debtor. The DIP Lender made the Pre-Petition Advance to the Debtor on the eve of the Petition Date to permit the Debtor to insure and protect the Property against further deterioration and to facilitate the filing of this chapter 11 case and a positive and successful outcome for the disposition of the Property. |
| **Waiver of Rights Under Section 506(c) (Local Rule 4001-5(a)(2)(C))**: | Yes. The DIP Lender is demanding a waiver of the rights under section 506(c) as a condition to making the DIP Loan. The waiver will only be enforceable upon entry of the Final Order in accordance with Local Rule 4001-5(b). *See* Interim Order ¶¶ 8, 15, 24. |
| **Lien on Avoidance Actions (Local Rule 4001-5(a)(2)(D))**: | None. In the interest of disclosure, the Property has been vacant for months, and there are few, if any, transfers that could be the subject of potential chapter 5 actions. |
| **Roll-Up Provisions (Local Rule 4001-5(a)(2)(E))**: | The Commitment provides for the roll-up of the Pre-Petition Advance and related fees into the DIP Loan. The roll-up is an essential element of the DIP Loan and the DIP Lender would not have agreed to provide the DIP Loan or enter into the Commitment without the roll-up. If the DIP Lender had not made the Pre-Petition Advance, and the Debtor had somehow been able to prepare (without paying for) the substantial documentation needed to present this case to the Court in a professional fashion, then the funds ($400,000.00), as a practical matter, would have been part of the DIP Loan.<br><br>Additionally, the Debtor could not have filed for chapter 11 until property insurance was paid and the property was secured, which required funds and the commitment of more funds.<br><br>As a practical matter, the Debtor also could not have filed for chapter 11 without providing Pillsbury (or a similarly competent firm) with a retainer to cover the expenses associated with commencing this chapter 11 case; indeed, Pillsbury was unwilling to undertake the substantial drafting and diligence associated with commencing this case and documenting the sale until the Debtor provided a meaningful retainer (which came from earmarked funds from the Pre-Petition Advance).<br><br>For these reasons, at the Debtor's request, the DIP Lender made the Pre-Petition Advance and the DIP Lender should be protected for the substantial risk it undertook, all of which will inure to the benefit of the bankruptcy estate, parties in interest, and the local community. *See* p. 2 of the Commitment; Interim Order ¶¶ K, 4. |

8

| | |
|---|---|
| **Provisions that Provide for Different Treatment for Professionals Retained by an appointed Committee or Limit the Committee's Use of the Carveout (Local Rule 4001-5(a)(2)(F))**: | None.  The Interim Order provides for a carveout for the U.S. Trustee's quarterly fees.  *See* Interim Order ¶ 8. |
| **Priming Liens Without the Consent of the Lienholder (Local Rule 4001-5(a)(2)(G))**: | As explained below, the DIP Lender is not willing to make the DIP Loan without first obtaining first-priority priming liens on the DIP Collateral.  Because the Property in its current state has either no or a negative market value, the affirmative consent of Existing Lienholders (which the Debtor will not be able to procure) is unnecessary, because Existing Lienholders are not entitled to adequate protection as a matter of law.  In its present state (without title unification and a free-and-clear sale order), the evidence will show that no one would pay anything for the Property since it is nothing but a liability as evidenced by the funds spent to date by the Debtor from the Pre-Petition Advance.  By approving this motion and allowing the process to proceed to consummation of a sale of the Property, the Court and the Debtor will be transforming the collateral securing Existing Lienholders from zero ($0) or worse, to collateral with an aggregate value equal to roughly the net sale proceeds.  *See* Interim Order ¶¶ J, 10. |
| **Provisions that Grant Relief from the Automatic Stay Without Further Order of the Court (Local Rule 4001-5(a)(2)(H))**: | The DIP Lender has demanded that in the event of a Termination Event or the Debtor's failure to perform any of its material obligations under the Interim Order, the DIP Lender be permitted, upon not less than five business days prior written notice to the Debtor and its counsel, the Office of the U.S. Trustee, and counsel for the Committee (and prior to its appointment, the Debtor's twenty largest unsecured creditors), to exercise any and all rights and remedies allowed under the Interim Order, the Commitment and applicable law.  *See* Interim Order ¶ 26. |

## Jurisdiction

11.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.     The Debtor

12.     The Debtor is an unincorporated condominium association existing under the laws of the State of Maryland.  The Debtor was established on January 11, 1974 pursuant to its by-laws and acts through its Board of Directors.

13.     The Property consists of two 7-story buildings with 219 apartment units, a parking lot and common areas.  The Property sits on approximately 4.8 acres of land and is

9

within walking distance of the Naylor Road Metro Station in Prince George's County, Maryland.

14.     Upon information and belief, some portion of the Property and some Units are encumbered with pre-petition mortgages and tax certificates held by various lienholders (the "Existing Lienholders").  The Debtor does not have any meaningful records to identify all Existing Lienholders or quantify the sums that may be owed.  Title work (to be funded from the DIP Loan), which should result in the identification of Existing Lienholders of record, has been underway since late December.

15.     As a condominium association, the Debtor relied on the payment of monthly condominium fees, which often was partial and woefully insufficient to pay utilities, insurance and other necessary expenses.  The Debtor's ability to collect condominium fees from each resident —which were the Debtor's sole source of funds—became increasingly difficult over the years.  As of the Petition Date, the Debtor estimates that the aggregate amount of condominium fees due to the Debtor exceeds $3 million.  Since expenses such as utilities were billed through the Debtor (and not to the prior unit owners), this explains why the condominium regime was doomed to failure.

16.     Over time, the Debtor's dire financial situation resulted in no property insurance for years, frequent threats by utility companies to disconnect utilities (in some instances, the utilities were disconnected) and no repairs or capital improvements to the Property.  These problems became so severe that the Debtor filed for bankruptcy multiple times.

**B.     The Debtor's Prior Bankruptcy Cases**

17.     The Debtor's first bankruptcy case was filed in this Court on October 13, 2005 and dismissed on March 31, 2009 because the Debtor made no significant progress towards confirming a feasible plan.  *See* Case No. 05-38059 ("*Lynnhill I*").

18.     On April 28, 2010, the Debtor filed its second bankruptcy case in this Court under chapter 11 of the Bankruptcy Code.  *See* Case No. 10-19462 ("*Lynnhill II*").  Although the Debtor confirmed a chapter 11 plan in *Lynnhill II*, the case was dismissed on April 17, 2014, after the Debtor fell behind on its post-confirmation obligations, the payment of quarterly fees and the filing of quarterly reports.  *See Lynnhill II*, Doc. 122.  Additional information regarding *Lynnhill I* and *Lynnhill II* are detailed in the Briscoe Declaration filed contemporaneously with this Motion.  *See* Briscoe Decl.¶¶ 9–10.

19.     On July 2, 2014, the Debtor filed its third bankruptcy case in this Court to forestall the Washington Suburban Sanitary Commission from cutting off water service.  *See* Case No. 14-20607 ("*Lynnhill III*").  The U.S. Trustee moved to dismiss the case within a month of its commencement citing the Debtor's failures in *Lynnhill II*.

20.     Rather than dismiss *Lynnhill III*, the Court ordered the appointment of a chapter 11 trustee (the "Chapter 11 Trustee") to give the Debtor "one final shot under the control of a third party."  *See Lynnhill III*, Doc. 48.

21.     On May 20, 2015, the Chapter 11 Trustee filed a plan that provided for a $5 million loan to the Debtor by Urban Investment Partners ("UIP") subject to completion of due diligence and approval by the Court.  The Chapter 11 Trustee proposed to use the loan proceeds to pay administrative expenses, the Debtor's future expenses and capital improvements to the Property.

22.     On October 30, 2015, the Chapter 11 Trustee moved to dismiss *Lynnhill III* after UIP withdrew its offer and attempts to find alternative sources of funding failed.  *See Lynnhill III*, Doc. 155 at ¶¶ 16–17.

23.     The Court entered an order dismissing *Lynnhill III* and, at the U.S. Trustee's

4844-2502-6905.v11

request, prohibiting the Debtor from refiling for bankruptcy for a period of two years. *See Lynnhill III*, Docs. 219, 253. The Court's dismissal order allows the Debtor to "modify the two year ban on refiling another bankruptcy case only upon showing that the Debtor is prepared to file a confirmable Plan." *See Lynnhill III*, Doc. 219.

24.     As explained herein, the Debtor now has the funding necessary to file and confirm a chapter 11 plan in short order, and a serious buyer with a demonstrated track record and financial ability to close on a sale of the Property.

**C.     The Property's Condition and the Circuit Court Order Authorizing the Debtor to Encumber and Sell the Property**

25.     Since the Court's dismissal of *Lynnhill III*, both the Debtor's financial condition and the Property's condition have deteriorated dramatically.

26.     All Units have been vacated and abandoned since September of 2017. The Debtor collects de minimis dues at best and the Property is not otherwise generating revenue (instead, it is incurring increasing expenses). For a period of time in November 2017 (after local police and fire authorities ceased monitoring the Property and before the Debtor entered into the Commitment with AHH and obtained its own 24-7 security), trespassers were entering onto the Property and removing valuable copper wiring and other infrastructure materials, presumably to sell for cash. Briscoe Decl. ¶¶18, 21; Williams Decl. ¶6; Kaufman Decl. ¶9. Thus, until AHH's cash infusion, the Property's zero or negative value continued to decline.

27.     The County has determined that the Property is uninhabitable and has threatened to condemn the Property because it is a threat to the public and a burden to the County. *See* Exhibit B. To attempt to keep unauthorized individuals from entering the Property, the Property is now monitored by security officers around the clock and surrounded by a fence. Despite these efforts, the Debtor from time to time receives reports of trespassers entering the Property

illegally.  With the aid of the security company, the winterization company and the County police, the Debtor expects to limit these nuisances (for both the Debtor and the County) until the new owner takes over.

28.     Aside from posing a liability to the Debtor, the community and local governments, the Property is (unfortunately) in a deplorable condition.  The hallways, stairwells, and units are literally filled with garbage, as well as human and non-human waste.  The professionals of the winterization company ("Global")—no strangers to difficult assets—have concerns that rodents (particularly packs of large rats) will interfere with their efforts absent appropriate extermination and other measures.  Rodents continue to infest the Property due to the trash and waste that clutters the interior and exterior of the Property.  *See* Kaufman Decl. ¶9.

29.     As indicated, the Property has no power.  Accordingly, Global brought in generation and has strung lighting (because in November vandals raided the copper wiring making the electric grid unreliable at best).  This will aid in efforts to address the trash, waste, vermin, and ultimately, the winterization (*i.e.*, pipe draining, boarding of windows and the like to protect from the elements, and covering of the roofs, which for a long time have been dilapidated).  *See* Kaufman Decl. ¶¶9–14.

30.     For the reasons stated by Circuit Court on the record and in its judgment, on October 4, 2017, the Circuit Court entered a judgment and order authorizing the Debtor to, among other things, (i) conduct a sale process and convey the Property through or outside of a chapter 11 bankruptcy process, and (ii) encumber the Property with first-priority liens to obtain financing to pay for insurance and the expenses associated with documenting, seeking bankruptcy court approval of, and closing the sale of the Property.  *See* Exhibit B.  In anticipation of the Circuit Court Order, on September 24, 2017, the Debtor agreed to retain

13

Transwestern as real estate broker to develop and implement a marketing and sale process to obtain the highest and best offer for the Property, including offers to finance a chapter 11 sale process.

### D.    Efforts to Find a Purchaser and DIP Lender

31.    As explained in the Williams Declaration, Transwestern launched a vigorous marketing process following its engagement by the Debtor.  Among other things, Transwestern prepared and sent marketing materials to over 3,500 parties, provided interested parties access to a "data room," and gave 19 tours of the Property.  Williams Decl. ¶12.  Transwestern then made an initial request for offers, setting November 17, 2017 as the offer deadline.  *Id.*  Transwestern received nine initial offers ranging from $1 million to $13.2 million; in the final round of bidding, Transwestern received five offers ranging from $7 million to $13.2 million.  *Id.* at ¶13.  AHH's offer was the best and highest offer at $13.2 million (subject to, among other things, title unification and confirmation of a plan providing for the free-and-clear sale of the Property), with a commitment to advance $400,000.00 pre-petition to fund expenses related to the Property and the commencement of this bankruptcy case, and provide debtor-in-possession financing to underwrite the chapter 11 plan-confirmation and sale process.  *Id.* at ¶15.

32.    No party offered to purchase the Property in its as-is condition (with title as is (one for each Unit) and subject to existing liens, claims and encumbrances).  Hence, there is no market for the Property in its current state, and its market value "as is" is zero or negative.  Williams Decl. ¶14.

33.    Other than AHH's bid, only one other bid included an offer to finance the chapter 11 sale process.  The terms of that alternative bid were significantly less favorable than AHH's because the interest rate and commitment fee were higher and the accompanying bid for

14

the Property (again, for unified title to the Property and on a free-and-clear basis) was at least $2.5 million *lower* than AHH's bid. *See* Bricoe Decl. ¶25; Williams Decl. ¶17.

### E.     The AHH Commitment

34.     On December 18, 2017, AHH and the Debtor executed the Commitment memorializing both AHH's offer to purchase the Property and to serve as the Debtor's pre- and post-petition secured lender.  AHH agreed to pre- and post-petition financing of up to $1,250,000.00, with $400,000.00 in pre-petition secured financing (the "Pre-Petition Advance") to fund certain bankruptcy and Property expenses.  Briscoe Decl. ¶26.

35.     On the same day, in consideration for the Pre-Petition Advance, the Debtor executed a $400,000.00 promissory note in AHH's favor and a deed of trust on the Property. Among other things, the Commitment required the Debtor to commence a bankruptcy case by January 12, 2018, and immediately move for authority to procure senior secured post-petition financing in accordance with the Commitment.  The Commitment also requires the Debtor to obtain the Interim and Final Order in form and substance acceptable to AHH, including the rolling-up of the Pre-Petition Advance.  Briscoe Decl. ¶26.

36.     As detailed further in the Briscoe Declaration, the Commitment also committed the Debtor to file a chapter 11 plan on the Petition Date (defined below) that provides for the sale of the Property to AHH for $13.2 million, minus a credit for all amounts advanced and accrued under the DIP Loan (*i.e.,* the DIP Claims) and a $1 million credit for certain life, health, and safety requirements of the County in connection with rehabbing the Property.  Briscoe Decl. ¶27.

37.     The Debtor and its professionals have worked diligently to prepare the filings and motions required to effectuate the Commitment.

38.     The Debtor commenced this chapter 11 case on January 10, 2018 (the "Petition

4844-2502-6905.v11

Date") and now seeks approval of the DIP Loan and related relief all in accordance with the Commitment, the Circuit Court Order and the Bankruptcy Code.

**Relief Requested**

39.     Pursuant to sections 105(a), 362, 363, 364 and 507 of the Bankruptcy Code, Rules 2002, 4001, 6004 and 9014, and Local Rules 4001-4 and 4001-5, the Debtor respectfully requests entry of an Interim and Final Order (a) authorizing the Debtor to obtain a $1,250,000.00 secured post-petition loan on the terms and conditions in the Commitment; (b) approving the Commitment; (c) authorizing the Debtor to grant liens and security interests on its assets as contemplated by the Commitment; (d) granting the DIP Lender (i) pursuant to section 364(c)(1), a superpriority administrative expense claim with priority over any or all administrative expenses subject to the Carveout (although the Debtor anticipates paying the U.S. Trustee's fees from the DIP Loan or the sale proceeds), and (ii) pursuant to section 364(c)(2) and (d), a first-priority priming lien on all of the Debtor's assets (now or hereafter acquired and all proceeds thereof); (e) authorizing the Debtor's use of the DIP Loan proceeds to, among other things, (i) pay expenses related to the Property, including security, winterization and maintenance and (ii) case administration costs and expenses; and (f) scheduling a Final Hearing before February 1, 2018.

**Basis for Relief Requested**

40.     The DIP Loan will allow the Debtor to preserve the Property until the Debtor can close on the sale of the Property to AHH.  The Debtor has no source of income to pay for property expenses, the administrative expenses of this case or the legal expenses associated with documenting and closing on the sale to AHH.  If the Debtor is unable to sell the Property, the County may condemn the Property to the detriment of the Debtor, its creditors and other interested parties.  The DIP Loan is therefore necessary to position the Property for sale and is in

4844-2502-6905.v11

the best interest of the Debtor, its estate and all parties in interest.

**A.      The Debtor Satisfies the Requirements for Obtaining Secured Post-Petition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

41.      Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is: (a) entitled to superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property, if the debtor cannot obtain post-petition credit on an unsecured basis, as an administrative expense priority or secured solely by junior liens on the debtor's assets.  *See* 11 U.S.C. § 364(c); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (authorizing superpriority administrative expenses where debtor could not obtain credit as an administrative expense).

42.      Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c).  Specifically, courts consider whether:

a.   the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

b.   the credit transaction is necessary to preserve the estate's assets; and

c.   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See id.* 195–96; *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011).  Courts also advocate using a "holistic approach" when evaluating post-petition financing agreements, focusing on the transaction as a whole.  As one court has explained:

> Obtaining credit should be permitted not only because it is not available elsewhere . . . but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).  *Here*, all of the factors support

approval of the DIP Loan.

*The Debtor Cannot Obtain Unsecured Financing*.

43.      The Debtor sought loan offers from all prospective purchaser sources prior to the Petition Date. *See* Bricoe Decl. ¶¶24–25; Williams Decl. ¶¶12–15. Despite those efforts, the Debtor was unable to obtain any unsecured financing as an administrative expense under sections 364(b) and 503(b)(1) of the Bankruptcy Code. Moreover, given the Debtor's multiple bankruptcy filings and financial problems, any credible lender would insist on first-priority liens as security for a loan. Consequently, the DIP Loan is the Debtor's only realistic financing option and is not available unless the Debtor grants the liens, superpriority claims, and the other protections set forth in the Interim Order. As explained below, the only alternative financing offer the Debtor received (from a competing purchaser offering a lower purchase price) was on terms significantly less favorable than those offered by the DIP Lender under the DIP Loan.

*The DIP Loan is Necessary to Prevent Further Deterioration to the Property and is an Exercise of the Debtor's Sound Business Judgment*.

44.      The Debtor needs the DIP Loan to pay for critical expenses associated with the Property that are required under the Commitment, including security, winterization and maintenance of the Property, as well as the expenses associated with obtaining approval for, documenting and closing on the sale of the Property to AHH.

45.      Absent the DIP Loan, the Debtor will be unable to satisfy its obligations under the Commitment, and the sale of the Property to AHH will be compromised. If the Debtor is unable to sell the Property promptly, the County might seek to condemn the Property to the detriment of all interested parties.

46.      The DIP Loan is also an exercise of the Debtor's sound business judgment. As explained above, the Debtor was unable to obtain secured credit on equal or more favorable

terms than those offered by the DIP Loan. The Debtor had only one alternative DIP loan offer, but the terms were less favorable than those offered by the DIP Lender: (i) the commitment fee was higher at 5% (approximately $62,500.00) versus $50,000.00 for the DIP Loan; (ii) the interest rate was significantly higher at 11% versus 6% for the DIP Loan; (iii) the terms of the alternative offer included a 2% exit fee; and (iv) the accompanying bid for the Property was $10.5 million, more than $2.5 million *lower* than AHH's bid. *See* Bricoe Decl. ¶25; Williams Decl. ¶16.

> *The DIP Loan is Fair and Reasonable and was Negotiated in Good Faith*.

47.     In determining whether a post-petition financing agreement is fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886–87 (Bankr. W.D. Mo. 2003) (finding that terms of post-petition financing were reasonable given context and relative circumstances of the parties).

48.     *Here*, the Debtor lacks the resources to maintain and preserve the Property while it closes on the sale to AHH. The Debtor also could not obtain financing on equal or more favorable terms. In contrast, the DIP Lender is undertaking substantial risk given the Property's condition and the Debtor's failed bankruptcies. The DIP Lender is neither a pre-petition lender advancing post-petition funds to protect its pre-existing loan position, nor a post-petition lender looking to originate a loan and make a return. Instead, the DIP Lender is making the DIP Loan solely to provide the Debtor with funding while it closes on the sale of the Property.

49.     Considering all of the circumstances, including the Debtor's dire financial condition and the substantial risk being underwritten by AHH, the DIP Lender should be compensated and protected accordingly. The commitment fee for the DIP Loan is within the range of reasonableness. Courts recognize that payment of lender fees may be necessary to

obtain post-petition financing and often approve payment of such fees.  *See, e.g.*, *Resolution Trust Corp. v. Official Unsecured Creditors' Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 316–19 (B.A.P. 9th Cir. 1992) (approving facility that included a lender "enhancement fee"); *see also In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (noting that post-petition financing arrangement may provide for payment of a commitment fee even if the financing arrangement is not consummated).

50.    Moreover, the roll-up of Pre-Petition Advance into the DIP Loan is an essential element of the DIP Loan.  The DIP Lender would not have agreed to provide the DIP Loan or enter into the Commitment without the roll-up.  And as noted above, the Debtor was unable to find a loan on better terms, let alone one that did not include a roll-up of the lender's pre-petition advance to facilitate the commencement of the Debtor's bankruptcy case and cover certain critical emergency property expenses.

51.    The Debtor could not have filed for chapter 11 without (i) property insurance, (ii) securing the Property, or (iii) providing a retainer to Pillsbury to cover the expenses associated with commencing this chapter 11 case, including the substantial drafting and diligence associated with commencing this case and documenting the sale.  For these reasons, the Debtor asked the DIP Lender to make the Pre-Petition Advance.  Regardless, had the DIP Lender not made the Pre-Petition Advance, and the Debtor had somehow found a way to file this chapter 11 case in a way that would avoid a fourth dismissal, the funds would certainly have been part of the DIP Loan as a practical matter.  For the good of all interested parties, AHH took on an incredible risk and should be appropriately compensated for it by giving AHH the benefit of its reasonable bargain.

52.    The DIP Loan was also negotiated in good faith and at arm's length between the

20

Debtor and the DIP Lender.  No consideration is being provided to any party in connection with the DIP Loan other than as set forth in the Commitment.  Moreover, the DIP Loan has been extended in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code.

53.    The DIP Loan is fair, reasonable and appropriate under the circumstances, and the DIP Lender should be afforded the full protection of section 364(e) if the Interim Order or any provision thereof is vacated, reversed or modified on appeal.  *See* 11 U.S.C. § 364(e).

**B.    Senior Secured Financing Pursuant to Section 364(d) is Appropriate**.

54.    If a debtor is unable to obtain credit solely under section 364(c), the debtor may obtain credit by a senior or equal lien on property of the estate that is already subject to a lien. *See* 11 U.S.C. § 364(d).  The Bankruptcy Code authorizes a debtor to grant senior secured priming liens if: (i) the debtor is unable to obtain financing without granting such liens, and (ii) the value of the secured creditors' liens that are being primed by the post-petition financing is adequately protected.  *See* 11 U.S.C. §§ 364(d)(1)(A) & (B).

*The Debtor is Unable to Obtain Financing Solely Under Section 364(c)*.

55.    Under section 364(d)(1)(A), the adequacy of a debtor's efforts to obtain post-petition financing is a case-specific inquiry.  Courts generally have found that a debtor's good-faith efforts to seek credit from other sources is sufficient to carry this burden.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (recognizing "the statute imposes no duty to seek credit from every possible lender"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992) (noting that while "[s]ection 364(d)(1) does not require the debtor to seek alternative financing from every possible lender," it "must make an effort to obtain credit without priming a senior lien").

21

56.     *Here*, the only other offer the Debtor received for post-petition financing also required the Debtor to grant a first-priority priming lien on the DIP Collateral and, as explained above, was on significantly less favorable terms than those offered by the DIP Lender.  The Debtor and its advisors engaged in rigorous, arm's length negotiations with the DIP Lender that produced the best available financing option under the circumstances.  Accordingly, the Court should find that post-petition financing other than on a senior secured basis is unavailable to the Debtor.

> *Existing Lienholders are Wholly Unsecured and Therefore not Entitled to Adequate Protection; the DIP Loan will Create Value (Where There is None) for Existing Lienholders.*

57.     Though several sections of the Bankruptcy Code refer to "adequate protection," the Bankruptcy Code does not expressly define the term.  Section 361 of the Bankruptcy Code, however, sets forth several non-exclusive examples of adequate protection, including: (1) making cash payments; (2) providing replacement liens; and (3) granting any other relief that will result in the secured party realizing the "indubitable equivalent" of its interest in the asset.  *See* 11 U.S.C. § 361.  Although section 361 presents some specific illustrations, the statute is broad and flexible, not exclusive.  *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631.

58.     Moreover, section 361(3) is regarded as a "catch-all" provision that gives courts discretion to determine what level of protection is appropriate to provide to a secured party under the circumstances.  *See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

59.     *Here*, the Existing Lienholders are wholly unsecured.  *See* Briscoe Decl. ¶21; Williams Decl. ¶14; Kaufman Decl. ¶15.  Therefore, as a matter of law, the Existing Lienholders

are not entitled to adequate protection. *See, e.g., In re Levitt and Sons, LLC*, 384 B.R. 630, 640–41 (Bankr. S.D. Fla. 2008) ("junior lien creditors' liens have no value because there is no value in the collateral beyond the Pre–Petition Debt owed to Wachovia on such collateral. Thus, the junior lien claimants are not entitled to adequate protection pursuant to 11 U.S.C. § 364(d) because at best they have a zero value lien.").[6]

60.    Moreover, given the Property's condition and multiple bankruptcies and sale attempts, the sale to AHH (which has a long way to go and a lot to be accomplished before closing) represents the last realistic chance for a transaction (short of government condemnation), and for Existing Lienholders to be paid anything. Indeed, if the Court denies the Motion, Existing Lienholders will recover nothing.

61.    Nonetheless, to give Existing Lienholders additional comfort, the Debtor proposes granting Existing Lienholders superpriority administrative expense claims that would be junior to the DIP Lender's Superpriority Administrative Expense Claim and the Carveout in the event that any can prove that the collateral securing their debt actually has positive value today (not taking into consideration the value that will accrete due to the Debtor's and AHH's plan to unify and clean title through the chapter 11 plan).

### C.    Interim Approval of the DIP Loan is Necessary to Prevent Immediate and Irreparable Harm.

62.    Rules 4001(b) and (c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen

---

[6]  The *Levitt* Court went on to hold that "[s]ince, the junior lien holders would receive nothing had there not been post-petition superpriority financing, they are not entitled to adequate protection. Notably, . . . junior lien holders will be afforded the opportunity to participate in, and receive a distribution from, a $3,000,000 guaranteed payment for the benefit of unsecured creditors, who would get nothing absent approval of the DIP Financing. . . . the Court finds as a matter of law that the junior lien holders are not entitled to adequate protection because they would receive nothing under non-bankruptcy law. As such, the Debtors have met their burden pursuant to 11 U.S.C. § 364." *Levitt*, 384 B.R. at 642.

days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the Debtor's estate. *See* Fed. R. Bankr. P. 4001(c)(2).  Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may grant certain forms of relief during the twenty-one days immediately following the filing date.  *See* Fed. R. Bankr. P. 6003.

63.    In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *In re Ames Dept. Stores*, 115 B.R. 34–36 (Bank. S.D.N.Y. 1990).  Moreover, after the fourteen-day period under Rule 4001, the request for financing is not limited to amounts necessary to prevent harm to the debtor's estate, and the debtor is entitled to borrow the amount it deems necessary.  *Id*.

64.    Immediate and irreparable harm would result if the Debtor is not granted immediate access to the DIP Loan to pay expenses, including security, winterization and maintenance of the Property, all of which are required by the Commitment and are necessary to preserve the Property.  The Debtor also needs immediate access to the DIP Loan to fund the administrative expenses of this chapter 11 case and give its professionals comfort while they continue providing the services necessary to get to document and close the sale of the Property to AHH.  Without immediate access to the DIP Loan, the Debtor will be unable to satisfy its obligations under the Commitment, compromising the sale of the Property to AHH; the only prospect for turning the negative value of the Property into net positive value.

### **Request for a Final Hearing**

65.    Pursuant to Rule 4001(c)(2), the Debtor requests that the Court set a date for the

24

Final Hearing that is as soon as practicable, but no later than January 31, 2018, and fix the time and date prior to the Final Hearing for parties to object to this Motion.

### Waiver of Rule 6004(a) and (h)

66.     To implement the relief requested in this Motion successfully, the Debtor seeks a waiver of the notice requirements under Rule 6004(a) of the Bankruptcy Rules and any stay of an order granting the relief requested herein pursuant to Rules 6004(h), 7062, 9014 of the Bankruptcy Rules or otherwise.

### Notice

67.     The Debtor has provided notice of this Motion to: (i) the Office of the U.S. Trustee; (ii) the Debtor's pre-petition lender; (iii) all parties listed on the Debtor's Schedule D (creditors who hold claims secured by property); (iv) the parties listed on the Debtor's list of creditors holding the 20 largest unsecured claims; and (v) any other party directly affected by this Motion.

*(Remainder of page intentionally left blank)*

4844-2502-6905.v11

## Conclusion

WHEREFORE, the Debtor respectfully requests that the Court (i) grant the Motion, (ii) enter an Interim Order, substantially in the form attached as **Exhibit D**, (iii) schedule a Final Hearing to consider entry of the Final Order before February 1, 2018, and (iii) grant such other and further relief as the Court deems just and proper.

Dated:  January 10, 2018

Respectfully submitted,

Pillsbury Winthrop Shaw Pittman LLP

*/s/ Patrick J. Potter*
Patrick J. Potter (Bar No. 08445)
1200 Seventeenth Street, NW
Washington, DC 20036
Tel (202) 663-8928
Fax (202) 663-8007
E-mail:  patrick.potter@pillsburylaw.com

Dania Slim (Bar No. 18050)
324 Royal Palm Way, Suite 220
Palm Beach, FL 33480
Tel (202) 663-9240
Fax (202) 663-8007
E-mail:  dania.slim@pillsburylaw.com

Jason Sharp (*pro hac vice* admission pending)
2 Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1028
Tel (713)276-7600
Fax (713)276-7673
Email:  jason.sharp@pillsburylaw.com

*Proposed Counsel for the Debtor*

4844-2502-6905.v11

**<u>Exhibit A</u>**

December 18, 2017

The Condominium Association of the Lynnhill Condominium
Attn: Mr. Stanley Briscoe – Acting President
c/o Patrick Potter
Pillsbury
1200 Seventeen Street, N.W.
Washington, D.C. 20016

**Amended Commitment Letter of**
**AHH16 Development, LLC or its Designee to Be Purchaser of the Property**
**and Post-Petition Secured Lender in Connection with Lynnhill Condominium Bankruptcy Case**

AHH16 Development, LLC ("***AHH***") is pleased to submit this amended commitment letter (this "***Commitment***) to The Condominium Association of the Lynnhill Condominium (the "***Association***"), which sets forth, among other things, AHH's commitment to cause its designee(s), in accordance with the terms set forth herein, to (i) purchase the Property (defined below), and (ii) act as post-petition senior secured lender in a Chapter 11 bankruptcy case (the "***Bankruptcy Case***") to be filed by the Association on or before January 10, 2018 (the "***Petition Date***") to effectuate the sale (the "***Sale***") of that certain real estate, amenities and improvements (including residential units) thereon located at 3103-3107 Good Hope Avenue, Temple Hills, Maryland 20748 (the "***Property***"), under a plan of reorganization (the "***Plan***") (or otherwise as set forth below). **AHH hereby submits its offer to purchase the Property, subject to other caveats not delineated herein for $13,200,000, as adjusted by the $1,000,000 credit described below** (*i.e.,* the Purchase Price, as defined below).

The Commitment is ***not*** all-inclusive and does ***not*** purport to enumerate or contain all of the terms, provisions and conditions that would be contained in definitive term sheets for DIP financing and documentation for the proposed Sale (and, if necessary, stalking horse bidder designation). Notwithstanding the foregoing, upon execution of this Commitment, the parties are contractually bound to comply with the terms of this Commitment, and to proceed with the transaction described herein. Moreover, AHH has completed its due diligence, and no further price adjustments will be made, and due diligence is not a basis for AHH to avoid complying with the Commitment.

Furthermore, this Commitment is not a solicitation of acceptances or rejections with respect to any restructuring or plan of reorganization. Any such solicitation will be conducted in accordance with the Bankruptcy Code and/or applicable non-bankruptcy law.

**A.**     ***Capital Commitments for Pre and Post-Petition Financing***

AHH (or its designee) has agreed to fund Association's bankruptcy costs in connection with preparing to file the Bankruptcy Case and confirming the Plan. AHH hereby confirms that, as of the date hereof and continuing through the date a final, non-appealable Order is entered confirming the Plan, and subject to Bankruptcy Court approval, AHH's designee will have available the cash commitments necessary to fund certain pre and post-bankruptcy costs of the Association, estimated by the Association at $1,250,000 (the "***Bankruptcy Funding Commitment***"), subject to the terms and conditions approved by AHH is its discretion.

Within one day after execution of this Commitment by the Association, and after the Association's execution of a promissory note in the amount of $400,000 and a deed of trust on the Property, AHH shall deposit with the Association's counsel $400,000 (the "***Pre-Petition DIP Funds***") to be held in escrow. AHH herby informs the Association that it intends to proceed with the Commitment and the Association's counsel is authorized to use up to $300,000 of the Pre-Petition DIP Funds to prepare the bankruptcy pleadings referenced above; the remaining $100,000 shall be used to pay for the insurance premium for the Property and for any additional miscellaneous expenses related to the Property which shall be subject to AHH's reasonable approval. Upon the filing of the Bankruptcy Petition, AHH shall deliver a $250,000 deposit (the "***Deposit***") to be credited against the Purchase Price (which deposit is not part of the Bankruptcy Funding Commitment).

Upon (or prior to) execution of this Commitment, the Association shall retain Global Restoration Services in connection with the winterization and remediation of the Property. At the same time that the Association files the Bankruptcy Petition, it shall file a motion seeking authority to retain Global Restoration Services ("***Global***") as the remediation company and seeking authorization to pay Global Restoration Services' pre-and post-petition fees out of the DIP loan, and/or shall seek to have the prepetition contract between the Association and Global assumed pursuant to Section 365 of the U.S. Bankruptcy Code.

On the Petition Date, the Association shall file a motion seeking approval of an order authorizing the Association to procure senior secured post-petition financing from AHH's designee to fund the Bankruptcy Funding Commitment (the "***DIP Order***"). The DIP Order, which shall provide for (i) accrual of interest (6% per annum; 12% default rate) and payment of fees (including a commitment fee of $50,000) to the DIP lender (collectively with the DIP loans, the "***DIP Claims***"), (ii) shall include a roll-up of any of the Initial DIP Funding advanced and any related fees and expenses of AHH, and (iii) must be in form and substance acceptable to AHH and its designee.

B.    ***Plan of Reorganization***

On the Petition Date, the Association shall file the Plan with an explanatory disclosure statement, which Plan shall include a provision selling the Property to AHH or its designee for the $13,200,000 less a credit of $1,000,000 for certain life, health and safety requirements of Prince George's County in connection with rehabbing the Property (the "***Purchase Price***"). AHH or its designee shall receive credit against the Purchase Price for all amounts and fees advanced or accrued under the DIP Order, and the Deposit. The plan shall provide, *inter alia*, that, in accordance with 11 U.S.C. Section 1146(a), the sale of the Property shall be free of transfer taxes (and any other related provision). On the same date, the Association will also file a motion seeking conditional approval of the disclosure statement and a combined hearing on approval of the disclosure statement and Plan confirmation.

C.    ***Sale Process and Stalking Horse Designation, if necessary***

In the event that the Bankruptcy Court does not confirm the Plan or requires a sale of the Property outside of a plan, the Association shall file a motion under Bankruptcy Code section 363 seeking approval of (i) AHH (or its designee) as the stalking horse bidder, entitled to the stalking horse bidder protections, and (ii) a court-ordered process to solicit bid proposals from qualified bidders, as determined by the Association and AHH in their reasonable discretion ("***Competing Bids***") to compete

against AHH's offer (the "***Bid Procedures Order***"), which shall be in form and substance acceptable to AHH.

If this process is required, then to the extent the Association receives a timely and properly submitted qualified Competing Bid that it believes is superior to this Commitment, in accordance with the strictures of the Bid Procedures Order, the Association shall conduct an auction pursuant to the Bid Procedures Order (the "***Auction***"). Any bidder that seeks to be designated as a bidder qualified to bid against AHH's bid must use the bid documents submitted by AHH and be bound to bid in the same fashion without material deviation, and must comply with the bidding strictures delineated in the Bidding Procedures Order. The bid protections (break-up fee and expense reimbursement-$800,000, bidding increment threshold $250,000 initial overbid, followed by $150,000 bidding increments) shall be in line with the market fees allowed by the courts in the relevant jurisdiction, and taking into account the extreme state of the Property.

Only AHH (or its designee) and a person or entity that timely and properly submitted a qualified Competing Bid may bid at the Auction. Thereafter, the Association shall present to the Bankruptcy Court an order approving the Sale to AHH (or its designee) or the Competing Bidder that submitted a higher bid than AHH (a "***Sale Order***").

**D.**    ***Termination of Commitment***

This Commitment shall terminate and be of no further force or effect and AHH (and its designees) shall no longer be obligated with respect to the Commitment, upon the earliest to occur of the following, unless waived in writing by AHH (each, a "***Termination Event***"):

- The Association fails to provide AHH and its agents with continuing reasonable and complete access to the Property, the Association's management (as may be requested from time to time) and the Association's books and records;

- The Association's failure to file a Chapter 11 petition, a DIP Motion and the Plan and Disclosure Statement, on or before January 12, 2018;

- The Association's failure to obtain an interim DIP Order reasonably acceptable to AHH, by January 22, 2018 and a final DIP Order, reasonably acceptable to AHH, on or before February 2, 2018;

- The Association's failure to obtain a final non-stayed and non-appealed order confirming the Plan reasonably acceptable to AHH, on or before February 13, 2018.

- The entry of an order limiting, precluding or preventing AHH (or its designees) from credit bidding or challenging any or all of the DIP Claims with respect to any proposed disposition of the Property (in connection with a plan, auction process, selection of a plan sponsor/funder or otherwise) at any time in the Associations' bankruptcy case(s);

- The Bankruptcy Case is converted to a chapter 7 case; and/or

- Mutual agreement of the Association and AHH.

### E.    *Miscellaneous*

All notices, requests, claims, demands and other communications hereunder shall be given to AHH (and shall be deemed to have been duly received if given) by hand delivery, in writing or by facsimile transmission with confirmation of receipt, as follows:

> AHH16 Development, LLC
> 178 Route 59, Suite 306
> Monsey, N.Y. 10952
> Attn: Jonathan Hook
> jhook@kindredproperties.com

with copies to:

> Shulman Rogers
> 12505 Park Potomac Avenue
> Potomac, MD 20854
> Attn: Michael J. Lichtenstein
> mjl@shulmanrogers.com
>
>   -and-
>
> Mark J. Nussbaum & Associates PLLC
> 225 Broadway - 39th Floor
> New York, NY 10007
> Attn: Mark J. Nussbaum, Esq.
> mnussbaum@mjnpllc.com

This Commitment and the rights of the parties, and all actions arising in whole or part under or in connection herewith will be governed by and construed in accordance with the laws of the State of Maryland.

This Commitment constitutes the entire agreement of parties hereto and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral. No modification or waiver of any provision hereof shall be enforceable unless approved by the parties hereto in writing.

Sincerely yours,

AHH16 Development, LLC
By:

Jonathan Hook
Managing Member

Accepted and agreed to:
The Condominium Association of the Lynnhill Condominium
Through its Board (in their representative, not individual, capacities)


By_____

      Stanley Briscoe – Acting President:
Signing for the Entire Board After
The Board Conducted a Vote Which
Was Unanimous to (a) Approve the Terms
of this AHH Commitment and
(b) Authorize Mr. Stanley Briscoe
To Execute the Letter Their Behalf as a Matter
Of Convenience

Accepted and agreed to:
The Condominium Association of the Lynnhill Condominium
Through its Board (in their representative, not individual, capacities)

By _____

     Stanley Briscoe – Acting President:
     Signing for the Entire Board After
     The Board Conducted a Vote Which
     Was Unanimous to (a) Approve the Terms
     of this AHH Commitment and
     (b) Authorize Mr. Stanley Briscoe
     To Execute the Letter Their Behalf as a Matter
     Of Convenience

**Exhibit B**

**IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY**
**CIVIL DIVISION**

| | | |
|---|---|---|
| CONSUMER PROTECTION DIVISION | ) | |
| OFFICE OF THE MARYLAND | ) | |
| ATTORNEY GENERAL | ) | |
| 200 St. Paul Place, 16th Floor | ) | |
| Baltimore, Maryland 21202, | ) | |
|                Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CAE16-40059 |
| | ) | |
| LYNNHILL CONDOMINIUM | ) | |
| DEVELOPMENT, INC. | ) | |
| 29 Gaither Street | ) | |
| Temple Hills, Maryland 20748 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN DOES 1-75, | ) | |
|                Defendants. | ) | |
| | ) | |
| LYNNHILL CONDOMINIUM | ) | |
| DEVELOPMENT, INC. | ) | |
| 29 Gaither Street | ) | |
| Temple Hills, Maryland 20748 | ) | |
|                Cross-Claim Plaintiff, | ) | |
| v. | ) | CROSS-CLAIM |
| | ) | |
| JOHN DOES 1-75, | ) | |
|                Cross-Claim Defendants. | ) | |
| | ) | |
| LYNNHILL CONDOMINIUM | ) | |
| DEVELOPMENT, INC. | ) | |
| 29 Gaither Street | ) | |
| Temple Hills, Maryland 20748 | ) | |
|                Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | THIRD-PARTY COMPLAINT |
| | ) | |
| JOHN DOES 1-219, et. al. | ) | |
|                Third-Party Defendants, | ) | |
| | ) | |
| | ) | |

## AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND AMENDED JUDGMENT

**THIS CAUSE** came to be heard on the _4TH_ day of October, 2017, upon (among other things) the pleadings filed herein, the evidence adduced, and the arguments of counsel; where upon the Court made (and makes) the following findings of fact and conclusions of law, and enters judgment accordingly:

1.     The Condominium Association of the Lynnhill Condominium (the "**Association**") is an unincorporated condominium association existing under the laws of the State of Maryland.

2.     The Association is responsible for managing, administering, and taking certain critical actions (and providing certain services) with respect to certain real estate, amenities and improvements (including residential units) thereon located at 3103-3107 Good Hope Avenue, Temple Hills, Maryland 20748 (the "**Property**"). The Property is generally described as two 7-story residential unit buildings (comprised of 219 living units, the "**Units**"), a single/shared parking lot, land and related common and non-common (e.g., office, utility space, etc.) areas and amenities; all situated on approximately 4.88 acres of land. Without limitation, the Property, including the land, the buildings and all improvements as well as easements, rights and appurtenances thereunto belonging, is described as (and includes) the real property now or formerly designated as:

> Parcel lettered "A" in the subdivision known as
> "LYNNHILL GARDENS" as per plat recorded in Plat
> Book WWW-56, Plat No. 87, among the Land Records of Prince
> George's County, Maryland.

3.     Presently, the Association acts through a board of directors (each a "**Member**"; more than one "**Members**"; and collectively, the "**Board**").

4.     Presently, the entirety of the Property, including but not limited to the Units, has been vacated and abandoned by those with interests in the Units.

The Property has been secured by a fence that surrounds the entire Property and Law Enforcement Officers, and to attempt to keep unauthorized individuals from accessing the Property. Prince George's County (the "**County**") has set October 2, 2017 as the deadline for individuals to remove any belongings from the Property. All utilities will be terminated at the Property by October 5, 2017. The Property is in disrepair and has been determined by the County to be uninhabitable. The Property is covered by no property-loss or any other insurance (*i.e.*, completely uninsured). The Association is without the financial resources sufficient to insure and maintain the Property through the closing on a sale of the Property. The Association or Council of Unit owners shall not seek to reconnect utilities pursuant to 11 U.S.C. 366 or subsequent bankruptcy filing.

5.     The Property, in its present state, represents a threat to the public and a burden to the County. The County has represented on the record to the Court it may condemn the Property in the near future.

6.     A solution to address the issues confronting the Association, owners of Units, the public, the County and others is required. Claims in this case, including requests for declaratory relief were brought in this action to obtain authorization from this Court to approve a strategy for adequately addressing these issues.

7.     Pursuant to the Court's legal, equitable and statutory powers, the Court possesses the authority to grant the relief set forth herein.

8.     The Association has proffered that it has received offers or expressions of interest from parties indicating a willingness to purchase the Property for prices ranging approximately from $11 million to $15 million. The purchaser would presumably rehabilitate the property in a way that reverses the threat to the public and the burden to the County. The Association has proffered that, if it is authorized to convey title to the entirety of the Property to a purchaser, that the proceeds would be distributed to creditors (of the Association and of Unit

3

owners) and to the Unit owners in accordance with an order of a court with jurisdiction to approve such distributions (either this Court or a U.S. Bankruptcy Court). The Association also proffered that first-priority debt financing (secured by the Property) will be required to obtain insurance and to fund the expenses (including those of professionals) that will be required to document the transaction, prosecute approval of the transaction and close the same. The foregoing is referred to as the "**Proposed Sale Process**."

9.      Based upon the record in the case and the findings of the Court, the Court finds that the Proposed Sale Process is in the best interest of all entities and individuals with claims against and interests in the Property.

10.      Accordingly, the Court hereby authorizes the Association to take all appropriate and necessary actions to sell the Property to a buyer that the Association, in the exercise of its business judgment, deems to be the highest and best offeror with the ability to close a transaction as soon as reasonably practicable ("**Purchaser**").

11.      The Association is authorized to conduct the Proposed Sale Process and convey the fee simple absolute Property through or outside of a chapter 11 bankruptcy process (in which latter case subject to the rulings of a bankruptcy judge of competent jurisdiction).

12.      The grounds for the Court's ruling are several. The Court holds that it may vest the Association with the authority to sell the Property in fee simple absolute under a number of circumstances, including (a) where the equities and public welfare require it; (b) where there has been a threat of condemnation; and (c) where the condominium regime is terminated and the Association becomes the effective owner of the Property for such purposes. The Court finds that each of these conditions exist, and that by necessity under the circumstances, and as a practical matter (where the Property has been fully vacated, is uninsured, lacking in financial resources, and possess a threat to the public and a burden to the

County), the condominium is for all intents and purposes terminated. The Association shall be deemed the fee simple absolute owner of the Property for the purpose of prosecuting the consummating the Proposed Sale Process, and making distributions subject to court order.

Based upon the foregoing, the Court concludes that the Association is entitled to Judgment.

### AMENDED JUDGMENT

**WHEREFORE**, it is by the Court this _2nd_ day of ~~October~~ *November*, 2017.

### ORDERED, ADJUDGED AND DECREED:

A.    The Association (through its Board) is immediately authorized to take any and all actions necessary (including but not limited to execution of all necessary documents, including but not limited to purchase agreements, deeds, and other conveyance documents), to prosecute and consummate the Proposed Sale Process (including obtaining debt financing secured by first-priority liens against the Property), and convey all right title of interest (regardless of holder) in the Property to the Purchaser. The foregoing authorization includes, but is not limited to, engaging professionals (e.g., real estate brokers/advisors, lawyers, etc. the "Association Professionals") to assist the Association in consummating the Proposed Sale Transaction, and distributing the proceeds thereof in accordance with applicable law. The foregoing authorization also includes the Association having access to the Property in order to enable brokers and potential purchasers to inspect (and conduct due diligence on) the Property, and no one shall interfere with the Association's rights to access the Property for such purposes. Access shall be coordinated with Prince George's County.

B.    All distributions to creditors (of the Association and Unit owners) and ultimately to Unit owners, shall be the subject of an order of this Court or a U.S. Bankruptcy Court.

C.    The condominium/condominium regime of the Lynnhill Condominium is hereby terminated.

D.    This case will remain open until the final distribution of sale proceeds.  This Court will retain jurisdiction to interpret its findings of fact and conclusions of law, and to enforce this judgment.

E.    The proposed version of this Order contained the following language, which this Court struck:

> "The Association is authorized to satisfy the costs of maintaining the Property (including insurance) and the costs of the Proposed Sale Transaction and other related costs (including the fees and expenses of Association Professionals) from the first proceeds of sale of the Property."

This language was stricken to avoid the appearance that the Court was pre-approving fees and expenses, including those of professionals.  Said deletion is without prejudice to the Association or any other party with appropriate standing to request in the future (whether from this Court or the Bankruptcy Court), allowance of fees, expenses, costs, etc., and to request that the same be paid from the proceeds of the sale of the Property or any other available assets; which requests this Court or the Bankruptcy Court (whichever possesses jurisdiction) may grant or deny as each may deem appropriate at that time.


IT IS SO ORDERED AND ADJUDGED.

_____
Judge Leo Green

Cc:

Law Office of William Johnson
William C. Johnson, Jr., Esq.
1310 L St. NW
Suite 750
Washington, DC 20005

Office of the Attorney General
Consumer Protection Division
200 St. Paul Place
16th Floor
Baltimore, MD 21202
(410) 576-7057
Attorneys for Plaintiff
mbrauer@oag.state.md.us
lcardwell@oag.state.md.us
rtrumka@oag.state.md.us

PEPCO
c/o Brian E. Hoffman, Esq.
Assistant General Counsel
701 Ninth Street, NW, Suite 1100
Washington, D.C. 20068

Washington Suburban Sanitary Commission
14501 Sweitzer Lane
Laurel, MD 20707

Washington Gas
409 Dorset Road
Devon, PA 19333

Nagle & Zaller, PC
7226 Lee Deforest, Suite 102
Columbia, MD 21046

Law Office of Gregory Singleton
5827 Allentown Rd.
Camp Springs, Maryland 20746

## NOTICE

The parties pursuant to the provisions of Prince Georges County Circuit Court and the Maryland Rules, may obtain a review of this matter by a Judge of the Circuit Court of Price Georges County, by filing a written motion complying with this Rule within ten (10) days of entry of this judgment.

**<u>Exhibit C</u>**

**Lynnhill DIP Loan Budget**

| | Legal | Security | Assistant/ Henderson | Press Notices | Title | Winterization and other preservation: snow, trash, rodents | KCC | Misc. – Storage, etc. | Totals |
|---|---|---|---|---|---|---|---|---|---|
| Week 1 1.10 – 1.20 | $146,000 | $5,750 | $900 | $7,500 | | $50,000 | $20,000 | $2,000 | $232,150 |
| Week 2 1.21 – 1.27 | $110,000 | $5,750 | $900 | | $10,000 | $20,000 | $20,000 | $2,000 | $168,650 |
| Week 3 1.28 – 2.3 | $90,000 | $5,750 | $900 | | | $10,000 | $20,000 | $2,000 | $128,650 |
| Week 4 2.4 – 2.10 | $165,000 | $5,750 | $900 | | | $5,000 | $20,000 | $2,000 | $198,650 |
| Week 5 2.11 – 2.17 | $155,000 | $5,750 | $900 | | | $5,000 | $20,000 | $2,000 | $188,650 |
| | $666,000 | $28,750 | $4,500 | $7,500 | $10,000 | $90,000 | $100,000 | $10,000 | $916,750 |

Notes: Post-petition legal may be used to pay January 2018 pre-petition legal that is not sufficiently covered by prepetition retainer.  Unused funds from the $100,000 pre-petition advance (for non-legal), estimated at $28,000, may be used for all post-petition expenses.  Unused post-petition advances on a week to week basis may be used for expenses incurred in subsequent weeks.  Debtor's cash on hand (excluding the $28,000 pre-petition advance) is approximately $33,000.  A $15,000 retainer was paid to KCC from the $100,000 pre-petition advance.

**<u>Exhibit D</u>**

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

| | |
|---|---|
| In re: | |
| THE CONDOMINIUM ASSOCIATION OF THE LYNNHILL CONDOMINIUM, | Case No. 18-10334 |
| | Chapter 11 |
| Debtor.[1] | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY CLAIMS, (III) SCHEDULING A FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

Upon the expedited motion (the "Motion") of the Condominium Association of the Lynnhill Condominium, as debtor and debtor-in-possession (the "Debtor"), for interim and final orders pursuant to sections 105(a), 362, 363, 364 and 507 of the U.S. Bankruptcy Code,[2] Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 4001-4 and 4001-5,[3] seeking, *inter alia:*

---

[1]  The Debtor's federal identification number is 52-0993760.
[2]  11 U.S.C. §§ 101–1532 (2012) (the "Bankruptcy Code").
[3] Unless otherwise indicated, section references are to the Bankruptcy Code, rule references are to the Bankruptcy Rules, and local rule references are to the Local Bankruptcy Rules of the U.S. Bankruptcy Court for the District of Maryland.

- 1 -

a.    authority to obtain a $1,250,000.00 secured post-petition loan (the "DIP Loan") from AHH16 Development, LLC or its designee ("AHH," or in its capacity as lender under the DIP Loan, the "DIP Lender") pursuant to the terms and conditions in the Motion and in the *Amended Commitment Letter of AHH16 Development, LLC or its Designee to Be Purchaser of the Property and Post-Petition Secured Lender in Connection with Lynnhill Condominium Bankruptcy Case* attached as **Exhibit A** to the Motion (the "Commitment"); and such DIP Loan:

    i.    having priority, pursuant to section 364(c)(1) of the Bankruptcy Code, over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code ("Superpriority Administrative Expense Claims"), except for the United States Trustee's quarterly fees (the "Carveout");

    ii.    being secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a perfected first-priority lien and security interest on any and all current and future assets of the Debtor of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable (excluding any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, including causes of action and recoveries pursuant to chapter 5 of the Bankruptcy Code), all other tangible and intangible assets, the Property,[4] and any and all proceeds of the foregoing (collectively, the "DIP Collateral"); notwithstanding anything to the contrary in this Interim Order or elsewhere, the DIP Collateral does not include funds received by Pillsbury Winthrop Shaw Pittman LLP that serve as a retainer for the fees and expenses incurred under its engagement with the Debtor;

    iii.    being secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by perfected first-priority senior priming liens on and in the DIP Collateral ranking prior to all other claims and liens. The Senior Priming Liens (defined below) will be senior in priority to security interests and liens securing the indebtedness and other obligations owing under any prepetition loan and security agreements and other liens. The Senior Priming Liens shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the DIP Lender; and

b.    to schedule a final hearing (the "Final Hearing") for this Court to consider entry of a final order authorizing the DIP Loan on a final basis.

The Debtor having requested in the Motion that pending the Final Hearing, a hearing be scheduled on an expedited basis (the "Interim Hearing") to consider entry of this Interim Order;

---

[4] Capitalized terms used but not defined in this Interim Order have the meanings given such terms in the Motion.

4811-7602-6457.v5

and notice of such Interim Hearing having been given to: (a) the Office of the U.S. Trustee for the District of Maryland; (b) parties identified on the Debtor's list of creditors holding the twenty largest unsecured claims; (c) counsel to AHH; (d) all applicable government and taxing authorities; (e) the U.S. Attorney's Office for the District of Maryland; (f) the Internal Revenue Service; and (g) all known parties that may assert a lien against, or may have an interest in, the DIP Collateral (collectively, the "Notice Parties"); and it appearing that on the record made in this case and after considering the Debtor's immediate need for interim financing, no other or further notice need be given; and the DIP Lender having agreed to provide the DIP Loan in accordance with the Commitment and this Interim Order.

NOW, THEREFORE, upon the Motion and the record of the Interim Hearing held on January 12, 2018; and after due deliberation and good and sufficient cause appearing therefore, the Court hereby makes the following findings of fact and conclusions of law:

Based upon the record presented to the Court, it appears that:

A.    *Filing*.  On January 10, 2018 (the "Petition Date"), the Debtor filed a voluntary chapter 11 petition in this Court.  The Debtor continues to manage and preserve (as best it can) the Property as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.    *Jurisdiction and Venue*.  This Court has core jurisdiction over this case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This Interim Order is entered in a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K) and (M).

C.    *Notice*.  Under the circumstances, the notice provided by the Debtor to the Notice Parties of the Motion and the Interim Hearing is sufficient and adequate and no further notice of the relief sought at the Interim Hearing is necessary or required.

- 3 -

D.    *Prince George's County Circuit Court Judgment.*    The Court acknowledges and takes judicial notice of the Circuit Court's Amended Findings of Facts, Conclusions of Law and Amended Judgment, *Consumer Prot. Div. Office of the Md. Attorney Gen. v. Lynnhill Condo. Dev., Inc.*, No. CAE16-40059 (Cir. Ct. Prince George's Cnty. Nov. 2, 2017), attached as **Exhibit B** to the Motion.

E.    *Condition of the Property.*    The uncontradicted record on the state of the Property is that (among other things):

1.    the Property is in a deplorable state;

2.    the Property is completely vacant, surrounded by fencing, subject to 24-7 surveillance by a private security company engaged by the Debtor and now paid for on a weekly basis from DIP Loan proceeds;

3.    the Property and all Units have been abandoned;

4.    the Property is not generating any income and (aside from the contemplated sale to AHH) there is no prospect of it doing so during these proceedings;

5.    the Property's interior and exterior is littered with trash, and human and animal excrement;

6.    the Property suffers from mold and fungus;

7.    the Property has been vandalized, and during November 2017, trespassers removed copper wiring and other assets without authorization;

8.    the Property is infested with vermin, including rats;

9.    the Property is without its own electrical power, running water or lights;

10.    the Property is unsafe; and

11.    the Property suffers from pre-petition structural deterioration (*e.g.*, eroded and eroding roofs).

F.    *Sale Efforts and Value.*    The uncontradicted record reflects (among other things):

1.    the Debtor's opinion is the Property (in its present condition with separate title to each Unit (*i.e.*, not unified) and without the cleansing of a section

- 4 -

363 free-and-clear order) is worth nothing (zero dollars), or has a negative value;

2. on or about September 27, 2017, after having interviewed approximately a half dozen brokers, the Debtor selected Transwestern Carey Winston, L.L.C. d/b/a Transwestern ("Transwestern") to market the Property for sale;

3. Transwestern launched a vigorous marketing process following its engagement by the Debtor; Transwestern prepared and sent marketing materials to over 3,500 parties, provided interested parties access to a "data room," and gave 19 tours of the Property; Transwestern then made an initial request for offers, setting November 17, 2017 as the offer deadline; Transwestern received nine initial offers ranging from $1 million to $13.2 million; in the final round of bidding, Transwestern received five offers ranging from $7 million to $13.2 million. AHH's offer was the best and highest offer at $13.2 million (subject to, among other things, title unification and confirmation of a plan providing for the free-and-clear sale of the Property), with a commitment to advance $400,000.00 pre-petition to fund expenses related to the Property and the commencement of this bankruptcy case, and provide debtor-in-possession financing to underwrite the chapter 11 plan-confirmation and sale process;

4. no bidder bid on the Property to purchase it in its as-is condition (with title as is and subject to existing liens, claims and encumbrances);

5. there is no market for the Property in its current state, and its market value "as is" is zero or negative; and

6. other than AHH's bid, only one other bid included an offer to finance the chapter 11 sale process; the terms of that alternative bid were significantly less favorable than AHH's because the interest rate and commitment fee were higher and the accompanying bid for the Property (again, for unified title to the Property and on a free-and-clear basis) was at least $2.5 million *lower* than AHH's bid.

G.    *Existing Lienholders*.  In the Motion, the Debtor indicates that, as of the Petition Date, (i) AHH holds a $400,000.00 perfected first-priority secured claim against the Debtor for a pre-petition loan advanced (made on or about December 18, 2017) to the Debtor under the Commitment  (the "Pre-Petition Advance") that is secured by valid, enforceable and perfected first-priority liens on the Property; (iii) the Debtor believes there are liens on the Property,

- 5 -

including certain units, held by various lienholders (the "Existing Lienholders"), but (subject to obtaining the results of title work that the Debtor represents is underway) does not know the identity of, or amounts that may be due, Existing Lienholders; and (iii) the Property constitutes substantially all of the Debtor's assets.

H.     *Need for Post-Petition Financing.*   The Debtor has an immediate need to obtain the DIP Loan.  Without the DIP Loan, the Debtor does not have sufficient capital to pay for the expenses associated with preserving the Property and administering this case.  The Debtor's ability to pay for security, winterization and maintenance of the Property is essential to the Debtor's ability to close on the sale of the Property to AHH.  The purpose of the DIP Loan will thus be to preserve and maintain the Property and effectuate a court-approved sale of the Property pursuant to the chapter 11 plan.

I.     *No Credit Available on More Favorable Terms*.   Given the Debtor's financial condition, the Debtor does not have sufficient capital to fund the expenses associated with preserving the Property, administering this case and closing on a sale of the Property.   The Debtor is also unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   Financing on a post-petition basis is not available without the Debtor's granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code, and securing such indebtedness and obligations with the security interests in and the liens on the DIP Collateral pursuant to section 364(c) and (d) of the Bankruptcy Code.   Additionally, the Debtor's only alternative offer for post-petition financing was on terms more onerous (*e.g.*, higher interest rate and higher commitment fee) than those offered by the DIP Lender under the DIP Loan.   Consequently, the Debtor is unable to

- 6 -

obtain post-petition financing on terms more favorable than those provided by the DIP Loan.

J.      *Need to Grant Superpriority Administrative Expense Claim and Senior Priming Liens.*  The Debtor is unable to obtain an unsecured credit facility allowable under section 503(b)(1) of the Bankruptcy Code and must grant the DIP Lender a Superpriority Administrative Expense Claim pursuant to section 364(c)(1) of the Bankruptcy Code (subject to the Carveout). The DIP Lender has conditioned all loans and advances to be made under the DIP Loan on obtaining: (a) a Superpriority Administrative Expense Claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any and all expenses of any kind or nature whatsoever specified in sections 503(b) and 507(b) of the Bankruptcy Code (other than the Carveout), including the Junior Superpriority Administrative Expense Claims (defined below); and (b) in accordance with section 364(c)(2) and (d) of the Bankruptcy Code, the Senior Priming Liens on and security interests in the DIP Collateral.

K.      *DIP Loan.*  Pursuant to the DIP Loan, the DIP Lender has agreed to make a loan to the Debtor in the principal amount of $1,250,000.00, consisting of $850,000.00 in principal of new money and a $400,000.00 (in principal) roll-up of the Pre-Petition Advance, including up to $75,000.00 of AHH's fees and expenses incurred in connection with the DIP Loan, the purchase of the Property or this case and any claim (arising from the Debtor's default and a breach) under the Purchase and Sale Agreement between the Debtor and AHH (collectively, the "DIP Claim"). The DIP Lender has agreed to make $450,000.00 of the DIP Loan available upon entry of this Interim Order and the balance of the DIP Loan (*i.e.*, $400,000.00 of new money) available upon entry of the Final Order, all in accordance with the Commitment and this Interim Order; provided that the new loan proceeds advanced post-petition shall be spent in accordance with the Budget attached as **Exhibit C** to the Motion.

- 7 -

L.    *Business Judgment and Good Faith.*  The terms of the DIP Loan, including the interest rates and fees applicable thereto, are more favorable to the Debtor than those available from alternative sources.  The terms of the DIP Loan have been negotiated in good faith and at arms' length between the Debtor and the DIP Lender, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are fair and reasonable under the circumstances and enforceable in accordance with applicable law.  The credit extended to the Debtor by the DIP Lender under the DIP Loan and this Interim Order were extended in "good faith" as that term is used in section 364(e) of the Bankruptcy Code and in express reliance on the protections set forth therein.  Consequently, the DIP Loan is entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

M.    *Need for Immediate Approval.*  The Debtor has requested immediate entry of this Interim Order pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules.  If the relief granted in this Interim Order is not granted on an expedited basis, the Debtor's estate will be immediately and irreparably harmed.  The Debtor has no alternative source of financing to meet its immediate and projected obligations, including those associated with the Property; consequently, it is essential that the Court approve the DIP Loan on an interim and immediate basis.  Authorizing the DIP Loan as set forth in this Interim Order is therefore in the best interests of the Debtor's estate and consistent with the Debtor's sound business judgment and fiduciary duties.

N.    *Record.*  The record adequately demonstrates the need for the Court to have conducted the Interim Hearing on the notice provided because of the potential for immediate and irreparable harm to the Debtor, the Property and the Debtor's estate.  Based on the record,

4811-7602-6457.v5

pursuant to sections 105(a), 363, and 364 of the Bankruptcy Code and Rule 4001(c), notice of the Interim Hearing was adequate as set forth herein and on the record.

Based upon the foregoing, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

## Approval and Authorization

1.      *Motion Granted.*  The Motion is granted on an interim basis and on the terms set forth herein.  Any objections to the Motion with respect to the entry of this Interim Order that have not previously been withdrawn or resolved are hereby denied and overruled.

2.      *Approval of Documents.* The DIP Loan and the Commitment are hereby approved subject to the terms of this Interim Order.  The failure to reference or discuss any particular provision of the Commitment shall not affect the validity or enforceability of any such provision.

3.      *Authorization to Execute and Deliver Documents.*  The Debtor is authorized, empowered and directed to do and perform all acts to make, execute, deliver and implement the Commitment and any other document required to be executed and delivered in connection therewith or with the DIP Loan.  Upon entry of this Interim Order, the obligations under the DIP Loan (the "DIP Claims") shall constitute valid, binding and nonavoidable obligations of the Debtor, enforceable against the Debtor in accordance with the terms of this Interim Order and the Commitment.  No obligation, payment, transfer or grant of security under the Commitment or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

4811-7602-6457.v5

4.      *Authorization to Borrow*.  Good and sufficient cause has been shown for the entry of this Interim Order.  The Debtor is authorized and empowered (i) upon entry of this Interim Order, to borrow $450,000.00 in new cash pursuant to the Commitment, and (ii) upon entry of the Final Order, to use the remaining balance of the DIP Loan (new cash of $400,000.00), in each case subject to the Budget.  The Debtor shall use the DIP Loan proceeds for the purposes set forth in the Motion and as permitted under the Commitment and this Interim Order, including to effectively repay the Pre-Petition Advance to the DIP Lender.  The Court reserves the right to unwind, after notice and hearing, the repayment of the Pre-Petition Advance, in  the  event  that there  is  a  timely  and  successful  challenge to the validity, enforceability, extent, perfection, or priority of the DIP Lender's pre-petition claims or liens, or a determination that the pre-petition debt was undersecured as of  the  petition  date  and  the  roll-up unduly advantaged the DIP Lender.

5.      *Amendments*.  The DIP Lender and the Debtor may amend, modify, supplement or waive any provision of the Commitment  if such amendment, modification, supplement or waiver is not material (in the good faith judgment of the DIP Lender and the Debtor), without having to request or receive further court approval.  Any material amendment, modification, supplement or waiver shall be in writing, signed by the parties and subject to court approval on appropriate notice.

**Payment of DIP Claims**

6.      *Payment of Principal, Interest, Fees, Etc*.  The Debtor shall pay to the DIP Lender the DIP Claims as provided in this Interim Order and the Commitment.  In consideration for the DIP Loan, the Debtor is authorized and directed, without further order of the Court, to pay all fees and charges and to reimburse the DIP Lender for all reasonable out-of-pocket expenses and professional fees, subject to a $75,000.00 cap, all as set forth herein, in the Motion and in the

- 10 -

Commitment (*i.e.*, the DIP Claims); *provided, however*, that if the Property is sold to the DIP Lender as anticipated, than all DIP Claims shall be credited against the purchase price.

7.     *DIP Lender's Accounting of Fees, Charges and Expenses*.  The DIP Lender and its counsel shall separately account for fees, charges and expenses incurred in connection with the pre- and post-petition financing from the fees, charges and expenses incurred in connection with all non-loan related matters, including but not limited to analyzing, negotiating, and taking steps to close on the purchase of the Property.

### Senior Superpriority Administrative Claim; Collateral

8.     *Superpriority Administrative Expense Claim; Waiver under Section 506(c)*. Subject to the Carveout, all of the DIP Claims shall have the status of an allowed Superpriority Administrative Expense Claim in the case pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtor, whether heretofore or hereafter incurred, of any kind or nature whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, including the Junior Superpriority Administrative Expense Claims, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code (collectively, the "Senior Superpriority Administrative Expense Claims").  No claim or expense having a priority senior or *pari passu* to the priority granted to the DIP Lender in this Interim Order shall be granted or permitted in this case, or any superseding chapter 7 case, and, subject

- 11 -

to entry of the Final Order, no other costs or expenses of administration of any kind, nature or description whatsoever shall be imposed against the DIP Collateral under sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise (subject to entry of the Final Order), in each case, while any portion of the DIP Claims remains outstanding.

9.      *Payment of Administrative Expenses*. Until an Event of Default (defined below) has occurred (or would result from such payment), the Debtor is permitted to pay, as the same may become due or authorized and payable, the quarterly fees of the U.S. Trustee and all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code incurred in the ordinary course of business, and to fund the retainers of the Debtor's professionals (and for the avoidance of doubt, such retainers shall not serve as DIP collateral, or any other form of security for the DIP Loan, and instead as collateral, against which the professionals hold a first priority perfected security interest, to ensure payment of the fees and expenses allowed by the Court).

10.     *Senior Priming Liens*.  As security for the full and timely payment of the DIP Claims, the DIP Lender is hereby granted pursuant to section 364(c)(2) and (d) of the Bankruptcy Code, senior, perfected priming liens on, and security interests in, all of the DIP Collateral (the "Senior Priming Liens").  Upon entry of the Final Order, the Senior Priming Liens shall be senior in priority to security interests and liens securing any indebtedness or other obligations owing under any prepetition loan and security agreements and other liens, including any liens of the Existing Lienholders.  Upon entry of the Final Order, the Senior Priming Liens shall not be subject to challenge, but instead shall attach and become valid and perfected without the requirement of any further action by the DIP Lender.

11.     *No Subordination*.  The liens on, and security interests in, the DIP Collateral

4811-7602-6457.v5

granted to the DIP Lender under this Interim Order and pursuant to the Commitment shall not be subordinated to, or made *pari passu* with, any other lien or security interest, however and whenever arising, in this case or any superseding chapter 7 case.

12.    *Automatic Perfection of Liens.*

(a) The liens and security interests granted to the DIP Lender hereunder and under the Commitment are valid, binding, continuing, enforceable and fully-perfected with the priorities herein and therein set forth.

(b) The DIP Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the liens and security interests granted by or pursuant to this Interim Order or the Commitment.

(c) Should the DIP Lender, in its sole discretion, from time to time, choose to file such financing statements, mortgages, notices of lien or similar instruments, take possession of any DIP Collateral securing the DIP Claims for perfection purposes, or take any other action to protect from infringement or otherwise validate or perfect any such security interest or lien, the Debtor and its officers are hereby directed to execute any such documents or instruments as the DIP Lender shall reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

(d) In the DIP Lender's discretion, a certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording, and such certified copy shall be deemed filed and recorded at the time and on the date of entry of this

- 13 -

Interim Order.

## Default

13.    *Default*.  Notwithstanding the provisions of section 362 of the Bankruptcy Code and without order of or application or motion to the Court, in the event of: (a) the Debtor's failure to perform any of its material obligations under this Interim Order, or (b) the occurrence and continuance of a Termination Event under the Commitment or the Purchase and Sale Agreement between the Debtor and AHH, then and upon the occurrence of any of the foregoing (each an "Event of Default"), and at all times during the continuance thereof, the DIP Lender may, upon not less than five business days prior written notice to the Debtor and its counsel, the Office of the U.S. Trustee, and counsel for the Committee (and prior to its appointment, the Debtor's twenty largest unsecured creditors), exercise any and all rights and remedies allowed under this Interim Order, the Commitment and applicable law.  The DIP Lender's failure to exercise rights under this paragraph shall not constitute a waiver of any of its rights.  At any hearing following an Event of Default, the Debtor shall be permitted to contest whether an Event of Default has occurred and is then continuing, but may not seek any relief that would in any way restrict or impair the rights and remedies of the DIP Lender set forth in this Interim Order, the Commitment or applicable law.

14.    *Due Date*. In addition to the DIP Lender's rights and remedies under this Interim Order, the DIP Loan shall immediately and automatically terminate and the DIP Claims shall be immediately due and payable on February 13, 2018, unless the contemplated confirmation or sale order is entered.

## Adequate Protection for the Existing Lienholders

15.    *Superpriority Administrative Expense Claim; Waiver under Section 506(c)*. While

- 14 -

the uncontroverted evidence is that the Property has no market value in its present state and condition, in accordance with section 507(b) of the Bankruptcy Code, the amount of diminution in value (if any) of the Existing Lienholders' liens in the Property following the Petition Date shall have the status of an allowed Superpriority Administrative Expense Claim in this case pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtor, whether heretofore or hereafter incurred, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, subject and junior only to the Senior Superpriority Administrative Expense Claims (the "Junior Superpriority Administrative Expense Claims").

## Miscellaneous Provisions

16.    *Binding Effect of Order; Successors and Assigns*.  The Commitment and this Interim Order shall be binding on all parties-in-interests in this case, including the DIP Lender, the Existing Lienholders, the Committee and the Debtor and their respective successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee or similar responsible person hereafter appointed as a representative of the Debtor's estate and any such successors or assigns, without further order of this Court and shall inure to the benefit of the DIP Lender, the Existing Lienholders, the Committee and the Debtor and their respective successors and assigns.

The Debtor and its successors and assigns shall be deemed authorized and directed to comply with the provisions of this Interim Order and Commitment.  The DIP Lender shall not have any obligation to extend any financing to any chapter 11 or chapter 7 trustee or similar responsible person appointed for the Debtor's estate.

17.    *No Impairment of Liens and Order*.  The liens, security interests, Senior Superpriority Administrative Expense Claims, DIP Claims and other rights and remedies granted to the DIP Lender in this Interim Order and the Commitment, and any actions taken pursuant hereto or thereto shall survive, and shall not be modified, altered or impaired in any manner by: (a) any other financing or extension of credit or incurrence of debt by the Debtor (under section 364 of the Bankruptcy Code or otherwise); (b) the entry of an order confirming any plan of reorganization (except that the plan filed by the Debtor provides for the crediting of the DIP Claims against the purchase price to be paid by AHH at the closing); (c) the entry of an order converting this case to chapter 7 or dismissing this case; or (d) the maturity of the DIP Loan. The liens, security interests, claims and any other rights granted to the DIP Lender in this Interim Order and the Commitment shall continue in effect until the DIP Claims are indefeasibly satisfied and paid, and the DIP Lender's commitment to make loans under the DIP Loan has terminated (all of which shall have occurred when the DIP Lender closes on the purchase of the Property and credits the DIP Claims as set forth in the plan and Commitment).

18.    *Good Faith*.  Having been found to be extending the DIP Loan to the Debtor in good faith, the DIP Lender is entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the DIP Loan, the DIP Claims and the Senior Superpriority Administrative Expense Claims and liens created or authorized by this Interim Order in the event that this Interim Order or any authorization contained herein is stayed, vacated, reversed or modified on

appeal.  If any provision of this Interim Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, then such modification, vacation, reversal or stay shall not affect the validity, enforceability and priority of the DIP Loan or the DIP Claims, liens and security interests granted to the DIP Lender under this Interim Order or the Commitment, and the validity, enforceability or priority of the DIP Loan and the DIP Claims, liens and security interests of the DIP Lender shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, privileges and benefits granted herein, including, without limitation, the liens, security interests and priorities granted to the DIP Lender in this Interim Order with respect to all DIP Claims.

19.    *Challenges in Respect of DIP Claims*. None of the advances under the DIP Loan may be used to prosecute actions, claims, demands or causes of action against the DIP Lender or to object to or contest in any manner, or to raise any defense in any pleading to the validity, perfection, priority or enforceability of the DIP Claims, the Senior Superpriority Administrative Claims or the Senior Priming Liens.

20.    *No Third Party Beneficiaries*. Other than as expressly set forth herein, no rights are created hereunder for the benefit of any third party, or any direct, indirect or incidental beneficiary.

21.    *No Marshaling*. In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

22.    *Limitations under Section 552(b) of the Bankruptcy Code*. Subject to entry of the Final Order, the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and no expenses of administration of the this case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the

4811-7602-6457.v5

Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral under section 552(b) of the Bankruptcy Code.

23.     *No Waiver*. Any delay or failure by the DIP Lender to exercise rights and remedies under the Commitment or this Interim Order shall not constitute a waiver of such party's rights, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the Commitment and this Interim Order.

24.     *Payments Free and Clear*. Any and all payments or proceeds remitted to the DIP Lender or Existing Lienholders pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code (subject to entry of the Final Order).

25.     *Insurance*. The DIP Lender is deemed to be the loss payee under the Debtor's insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies to the payment in full of the DIP Claims.

26.     *Automatic Stay*.  Subject to entry of the Final Order, the automatic stay imposed by section 362 of the Bankruptcy Code shall be vacated and modified as necessary to permit the DIP Lender to take any action authorized or contemplated by the Commitment and to carry out the terms thereof, subject, however, to the satisfaction of any notice, procedural and other conditions contained therein and herein.

27.     *No Control*.  Subject to entry of the Final Order, by consenting to this Interim Order, by making advances, loans or extending financial accommodations of any type, kind or nature under this Interim Order or by administering the loans made hereunder, the DIP Lender

- 18 -

shall not be deemed to be in control of the Debtor's operations or to be acting as a "responsible person," "managing agent" or "owner or operator" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtor.

28.    *Indemnification*. Subject to the entry of the Final Order, nothing in this Interim Order or the Commitment shall in any way be construed or interpreted to impose or allow the imposition on the DIP Lender any liability for any claims arising from the Debtor's pre- or post-petition activities in the operation of its business, or in connection with its restructuring efforts. So long as the DIP Lender complies with its respective obligations under this Interim Order and the Commitment and its obligations under applicable law (including the Bankruptcy Code): (a) the DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person; and (b) all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtor.

29.    *Inconsistency*. In the event of any inconsistency between this Interim Order and the Commitment, any document or any other agreement heretofore or hereafter entered into by and between the Debtor, the DIP Lender and/or the Existing Lienholders, the terms of this Interim Order shall govern and control.

30.    *Retention of Jurisdiction*. This Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan in this case notwithstanding the terms or provisions of

4811-7602-6457.v5

any such chapter 11 plan or any order confirming any such chapter 11 plan.

31.     *Immediate Docketing of Order*. The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of this Court maintained in this case.

32.     *Effectiveness*. In accordance with Rule 7052, this Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof.  Notwithstanding Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

33.     *Headings*. Section headings used in this Interim Order are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

34.     *Notice of Final Hearing; Objections*.  On or before January 17, 2018, the Debtor shall transmit copies of a notice of the entry of this Interim Order to those parties that received notice of the Interim Hearing and to any party which filed prior to such date a request for notices with this Court.  The notice of entry of this Interim Order shall state that any party in interest objecting to the DIP Loan on a final basis and the entry of the Final Order shall file written objections with the Clerk of the U.S. Bankruptcy Court for the District of Maryland no later than 4:00 p.m. (prevailing Eastern Time) on January [24], 2018 and shall serve such objections so that the same are received on or before such date by: (a) Debtor's counsel, Pillsbury Winthrop Shaw Pittman LLP, 1200 Seventeenth Street NW, Washington, DC 20036 (Attn: Patrick Potter, patrick.potter@pillsburylaw.com) and Pillsbury Winthrop Shaw Pittman LLP, 324 Royal Palm Way, Suite 220, Palm Beach, FL 33480 (Attn: Dania Slim, dania.slim@pillsburylaw.com); (b)

4811-7602-6457.v5

the DIP Lender's counsel, Shulman, Rogers, Gandal, Pordy & Ecker, P.A., 12505 Park Potomac

Avenue, 6th Floor, Potomac, MD 20854 (Attn: Michael J. Lichtenstein, Esq.,

mlichtenstein@shulmanrogers.com); (c) counsel to the Committee (if any); and (d) Office of the

U.S. Trustee for the District of Maryland, 6305 Ivy Lane, Suite 600, Greenbelt, MD 20770.

35.    *Final Hearing*. The Final Hearing will be held on January [30], 2018 at [11:00

a.m.] (prevailing Eastern Time).

**End of Order**


cc:    Patrick J. Potter
       Pillsbury Winthrop Shaw Pittman LLP
       1200 Seventeenth Street, NW
       Washington, DC 20036

       Dania Slim
       Pillsbury Winthrop Shaw Pittman LLP
       324 Royal Palm Way, Suite 220
       Palm Beach, FL 33480

       Jason S. Sharp
       Pillsbury Winthrop Shaw Pittman LLP
       2 Houston Center
       909 Fannin, Suite 2000
       Houston, TX 77010-1028

       William C. Johnson, Jr.
       1310 L Street NW, Suite 750
       Washington, DC 20005

       Michael J. Lichtenstein
       Shulman Rogers
       12505 Park Potomac Avenue
       Potomac, MD 20854

       All Parties Requesting Notice

4811-7602-6457.v5